# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **ROBERT C. BROWN,** ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civil Action No. 1:06cv00041 |
| ) | **MEMORANDUM OPINION** |
| ) | |
| ) | |
| **JO ANNE B. BARNHART**, ) | |
| **Commissioner of Social Security,** ) | By:   PAMELA MEADE SARGENT |
| Defendant ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

*I. Background and Standard of Review*

Plaintiff, Robert C. Brown, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423. (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

-1-

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Brown protectively filed his application for DIB on or about March 4, 2004, alleging disability as of March 1, 2004, based on sleep apnea, high blood pressure, diverticulosis, knee problems, back problems and leg problems. (Record, ("R."), at 42, 43-45, 50.) The claim was denied initially and upon reconsideration. (R. at 29-33, 34, 35-37.) Brown then requested a hearing before an administrative law judge, ("ALJ"). (R. at 38.) The ALJ held a hearing on October 31, 2005, at which Brown was represented by counsel. (R. at 174-229.)

By decision dated January 17, 2006, the ALJ denied Brown's claim. (R. at 14-20.) The ALJ found that Brown met the disability insured status requirements of the Act for DIB purposes on the alleged onset date, and continued to do so through September 30, 2008. (R. at 19.) The ALJ found that Brown had not performed substantial gainful activity since March 1, 2004. (R. at 19.) The ALJ also found that the medical evidence established that Brown suffered from severe impairments, namely degenerative disc disease and degenerative joint disease of the cervical spine, degenerative joint disease of the knees and fatigue from sleep apnea, but he found that Brown's impairments did not meet or medically equal the requirements of any

impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) The ALJ also found that Brown's allegations regarding his limitations were not totally credible. (R. at 19.) The ALJ found that Brown retained the residual functional capacity to perform light work[1] that allowed the opportunity to change postural positions at 30-minute intervals, that did not involve more than minimal exposure to hazards or extremes of temperature, wetness or humidity and that could be performed by an individual with borderline intellectual functioning and fatigue from sleep apnea. (R. at 19.) Thus, the ALJ found that Brown could not perform his past relevant work. (R. at 19.) Based on Brown's age, education, and work history and the testimony of a vocational expert, the ALJ concluded that Brown could perform jobs existing in significant numbers in the national economy, including those of a security guard and a protective service worker. (R. at 19.) Thus, the ALJ found that Brown was not disabled under the Act at any time through the date of the ALJ's decision, and was not eligible for DIB benefits. (R. at 19-20.) *See* 20 C.F.R. § 404.1520(g) (2006).

After the ALJ issued his decision, Brown pursued his administrative appeals, (R. at 9), but the Appeals Council denied his request for review. (R. at 6-8.) Brown then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2006). The case is before this court on the Commissioner's motion for summary judgment filed September 6, 2006.

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with lifting or carrying of items weighing up to 10 pounds frequently. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2006).

-3-

## II. Facts

Brown was born in 1952, (R. at 43), which classifies him as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). Brown has a high school education and vocational education in carpentry. (R. at 54.) He has past work experience as a dairy farmer and a carpenter. (R. at 51, 198-99.)

Brown testified at his hearing that he was unable to work due to sleep apnea, diabetes, high blood pressure and herniated discs. (R. at 188-89.) He testified that he experienced some tension and stress due to money problems, family worries and not being able to work. (R. at 209-10.) He stated that he had not sought psychological treatment, nor was he prescribed any psychological medication. (R. at 215.)

Marvin Gardner, Ph.D., a clinical psychologist, also testified at Brown's hearing. (R. at 212-20.) Gardner testified that, with the exception of Lanthorn's report, there was no other psychological records contained in the record. (R. at 213.) Gardner testified that Brown's condition would not meet or equal the listed impairment for mental retardation found at § 12.05. (R. at 213.)

Ann Marie Cash, a vocational expert, also testified at the hearing. (R. at 220-28.) Cash was asked to consider a hypothetical individual of Brown's age, education, background and work experience, who could lift items weighing up to 20 pounds occasionally and 10 pounds frequently; stand or walk for a total of six hours and sit six hours in an eight-hour workday with normal breaks; push, pull, handle and manipulate items up to 20 pounds occasionally; and who would need to avoid

moderate exposure to cold, heat, wetness, humidity, fumes, odors, dust and poor ventilation. (R. at 223.) Cash testified that jobs existed in significant number that the individual could perform, including security jobs, a protective service worker and a stock clerk. (R. at 223-25.) Cash was then asked to add to the hypothetical the need to alternate sitting and standing every 30 minutes. (R. at 225.) Cash testified that the stock clerk would be the only job that would be an issue, but that job could be replaced with the job of a courier or a messenger. (R. at 225.)

In rendering his decision, the ALJ reviewed records from Tazewell County Public Schools; Dr. Eduardo T. Tolosa, M.D.; Tazewell Community Hospital; Dr. Steven B. O'Saile, D.O.; Dr. Gary Craft, M.D.; Dr. Gary Parrish, M.D., a state agency physician; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; and Dr. Phil Peterson, M.D.

Brown's school records indicate that when he was in the second grade, a Kuhlmann Anderson intelligence test revealed an IQ score of 78. (R. at 86.) In the fourth grade, Brown obtained a verbal IQ score of 84, a performance IQ score of 90 and a full-scale IQ score of 87. (R. at 88.) In the fifth grade, Brown obtained a verbal IQ score of 92, a performance IQ score of 91 and a full-scale IQ score of 92. (R. at 88.)

On July 30, 2002, Brown saw Dr. Eduardo T. Tolosa, M.D., for complaints of chest pain, shortness of breath and general body malaise. (R. at 100-01.) Dr. Tolosa noted that Brown had a history of hypertension and tobacco and alcohol abuse. (R. at 101.) Examination revealed unremarkable results with the exception of his blood

pressure being 190/130. (R. at 100.) A chest x-ray was normal. (R. at 102.) Brown was admitted to Tazewell Community Hospital and was diagnosed with hypertensive crisis, angina and chronic obstructive pulmonary disease. (R. at 100.)

On August 22, 2002, Brown underwent a sleep study at Tazewell Community Hospital, which indicated that Brown suffered from obstructive sleep apnea syndrome of moderate intensity associated with mild derangement of nocturnal oxygenation. (R. at 92-93.) In consultation with Dr. German Iosif, M.D., Brown admitted to consuming up to three cans of beer within two hours before bedtime on a regular basis, as well as smoking two packs of cigarettes per day. (R. at 92.) Dr. Iosif opined that Brown could certainly benefit from weight loss and cutting back on alcoholic consumption in the evening hours. (R. at 93.) On October 17, 2002, Brown underwent another sleep study with a C-PAP titration. (R. at 90-91.) Dr. Iosif opined the study with the use of C-PAP titration to be a successful treatment of obstructive sleep apnea syndrome, and Brown was prescribed with a C-PAP machine. (R. at 91.)

On March 8, 2005, Brown was admitted to Tazewell Community Hospital for complaints of chest pain. (R. at 139-53.) He was diagnosed with coronary artery disease, rule out myocardial infarction, hypertension, history of tobacco and alcohol abuse and questionable prediabetic. (R. at 139-53.)

On January 21, 2003, Brown saw Dr. Steven B. O'Saile, D.O., for complaints of right knee pain. (R. at 171-72.) Examination revealed moderate effusion with neurovascular status intact. (R. at 172.) Dr. O'Saile diagnosed right knee effusion with internal derangement. (R. at 172.) An aspiration was performed, and Brown

reported that he felt dramatically better. (R. at 172.) On September 9, 2003, Brown continued to complain of right knee pain. (R. at 173.) He was diagnosed with right knee effusion and proximal tibial contusion. (R. at 173.) An aspiration was performed. (R. at 173.)

On June 22, 2004, Dr. Gary Craft, M.D., examined Brown at the request of Disability Determination Services. (R. at 122-27.) Brown complained of right knee and neck pain. (R. at 122.) Examination of Brown's upper extremities revealed a full range of motion and intact grip strength. (R. at 123.) Dr. Craft noted a minimal loss of motion in the neck, back and right knee. (R. at 123-24.) An x-ray of Brown's lumbosacral spine revealed minimal osteoarthritis, and an x-ray of the right knee was unremarkable. (R. at 124.) An MRI of Brown's right knee showed small joint effusion and possible bone contusion. (R. at 116.) Dr. Craft did not detect any respiratory distress or end-organ damage due to hypertension or diabetes. (R. at 124-25.) Dr. Craft could not detect any deterioration of personal habits, constriction of interest or any restriction of physical activities related to a mental condition. (R. at 125.) Dr. Craft opined that Brown was able to do light work and was free of any manipulative or workplace limitations. (R. at 125.) However, Dr. Craft opined that Brown should avoid high humidity, extreme changes in temperature and gases and dust secondary to his lung disease. (R. at 125.)

On September 8, 2004, Dr. Gary Parrish, M.D., a state agency physician, opined that Brown could perform light work. (R. at 128-34.) No postural, manipulative, visual or communicative limitations were noted. (R. at 130-31.) Dr. Parrish indicated that Brown should avoid moderate exposure to extreme heat or cold, wetness,

humidity, and fumes, odors, dusts, gases and poor ventilation. (R. at 131.) Dr. Parrish reported that Brown's statements regarding his alleged symptoms were partially credible, and that Brown described daily activities that were not significantly limited in relation to his alleged symptoms. (R. at 133.) This assessment was affirmed by Dr. Robert O. McGuffin, M.D., another state agency physician, on November 2, 2004. (R. at 134.)

On June 17, 2005, B. Wayne Lanthorn, Ph. D., a licensed clinical psychologist, evaluated Brown at the request of Brown's attorney. (R. at 154-62.) The Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), was administered, and Brown obtained a verbal IQ of 79, a performance IQ of 70 and a full-scale IQ score of 73. (R. at 155, 158.) The Pain Patient Profile, ("P/3"), test was administered, which indicated that Brown scored in the most severe range of the depression, anxiety and somatization scales. (R. at 159.) Lanthorn described Brown's overall mood as a combination of depression and anxiety. (R. at 157.) Brown stated that he had never had psychological treatment. (R. at 157.) Brown reported being depressed and nervous, particularly around many people. (R. at 157.) Lanthorn diagnosed Brown with major depressive disorder, single episode, severe, an anxiety disorder with generalized anxiety due to ongoing substantial physical difficulties and associated chronic pain, a pain disorder associated with both psychological factors and a general medical condition, chronic, and borderline intellectual functioning. (R. at 161.) Lanthorn assessed Brown's then-current Global Assessment of Functioning, ("GAF"), score at 45-50[2]. (R. at 161.)

---

[2]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION*, ("DSM-IV"), 32 (American

Lanthorn completed a mental assessment, indicating that Brown had moderate limitations in his ability to understand, remember and carry out short, simple instructions. (R. 165.) Lanthorn opined that Brown was severely limited, but not precluded, in his abilities to understand, remember and carry out detailed instructions, to make judgments on simple work-related decisions, to interact appropriately with the public, with supervisors and with co-workers and to respond appropriately to work pressures and changes in a usual work setting. (R. 165-66.)

On October 12, 2005, Dr. Phil Peterson, M.D., completed a medical assessment, indicating that Brown could occasionally lift and/or carry items weighing up to 20 pounds.[3] (R. at 167-70.) Dr. Peterson opined that Brown could stand and/or walk less than two hours in an eight-hour workday, and must periodically alternate between sitting and standing. (R. at 167-68.) Dr. Peterson opined that Brown was limited in his ability to push or pull with his lower extremities, and that he could occasionally climb or crawl, but should never balance, kneel, crouch or stoop. (R. at 168.) Dr. Peterson noted no manipulative or visual/communicative limitations. (R. at 169.) Dr. Peterson opined that Brown was limited in his ability to work around temperature extremes, noise, dust, vibration, humidity, wetness, fumes, odors, chemicals, gases and hazards such as machinery or heights. (R. 170.)

---

Psychiatric Association 1994). A GAF of 41-50 indicates that the individual has serious symptoms or serious impairments in social, occupational or school functioning. *See* DSM-IV at 32.

[3]The record does not contain any treatment notes from Dr. Peterson.

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2006).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated January 17, 2006, the ALJ denied Brown's claim. (R. at 14-20.) The ALJ found that the medical evidence established that Brown suffered from severe impairments, namely degenerative disc disease and degenerative joint disease

of the cervical spine, degenerative joint disease of the knees and fatigue from sleep apnea, but he found that Brown's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) The ALJ found that Brown retained the residual functional capacity to perform light work that allowed the opportunity to change postural positions at 30-minute intervals, that did not involve more than minimal exposure to hazards or extremes of temperature, wetness or humidity and that could be performed by an individual with borderline intellectual functioning and fatigue from sleep apnea. (R. at 19.) Thus, the ALJ found that Brown could not perform his past relevant work. (R. at 19.) Based on Brown's age, education, and work history and the testimony of a vocational expert, the ALJ concluded that Brown could perform jobs existing in significant numbers in the national economy, including those of a security guard and a protective service worker. (R. at 19.) Thus, the ALJ found that Brown was not disabled under the Act at any time through the date of the ALJ's decision, and was not eligible for DIB benefits. (R. at 19-20.) *See* 20 C.F.R. § 404.1520(g) 2006.

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Brown argues that the ALJ erred in finding that his condition did not meet or equal the listed impairment for mental retardation found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(C). (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-9.)[4] Brown also argues that the ALJ erred by failing to find that his depression and anxiety were severe impairments. (Plaintiff's Brief at 8-11.) Brown does not contest the ALJ's finding with regard to his physical residual functional capacity.

Brown contends that his mental impairment meets or equals the criteria for § 12.05(C), the listing for mental retardation. To meet the impairment requirements of § 12.05(C), a claimant's mental functioning must be limited to the extent that he scores between 60 and 70 on a valid IQ test, and he must suffer from another impairment that imposes a significant work-related limitation. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C) (2006). Additionally, the mental deficits must have

---

[4]Brown did not file a motion for summary judgment.

-12-

manifested during the claimant's developmental stage, i.e., prior to age 22. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. Lanthorn found that Brown had a verbal IQ score of 79, a performance IQ score of 70 and a full-scale IQ score of 73. (R. at 155, 158.) Brown's school record show that while in the fifth grade, Brown obtained a verbal IQ score of 92, a performance IQ score of 91 and a full-scale IQ score of 92. (R. at 88.) In addition, the vocational expert classified two of Brown's past relevant jobs as semi-skilled work. (R. at 221-22.) Furthermore, the psychological expert testified at Brown's hearing that Brown's condition did not meet or equal the listing of § 12.05(C). (R. at 213.) For these reasons, I find that Brown is unable to meet the first prong of § 12.05(C). That being the case, it is unnecessary to analyze whether he meets the second prong. Based on the above, I find that substantial evidence exists to support the ALJ's finding that Brown did not meet or equal § 12.05(C).

Based on my review of the record, I also reject Brown's argument that the ALJ erred by failing to find that his depression and anxiety were severe impairments. (Plaintiff's Brief 8-11.) The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a) (2006). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. § 404.1521(b) (2006). The Fourth Circuit held in *Evans v. Heckler*, that, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the

individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted).

While Lanthorn opined that Brown suffered from major depression and an anxiety disorder, resulting in moderate limitations on his ability to understand, remember and carry out short, simple instructions and severe limitations on his abilities to understand, remember and carry out detailed instructions, to make judgments on simple work-related decisions, to interact appropriately with the public, with supervisors and with co-workers and to respond appropriately with work pressures and changes in a usual work setting, the ALJ gave little weight to this assessment because it was not supported by Lanthorn's own clinical findings, the objective evidence of record or any other opinion of record. (R. at 17, 165-66.) The ALJ also noted that the record did not contain any other objective evidence to support the diagnosis of depressive or anxiety disorder and that Brown had never sought nor been referred for ongoing treatment by a mental health professional. (R. at 17.) In June 2004, Dr. Craft reported that he could not detect any deterioration of personal habits, constriction of interest or any restriction of physical activities related to a mental condition. (R. at 125.) Furthermore, the psychological expert testified at Brown's hearing that Brown's condition did not meet or equal a listing. (R. at 213.) Based on this, I find that substantial evidence exists to support the ALJ's failure to find that Brown's depression and anxiety were severe impairments.

-14-

## IV. Conclusion

For the foregoing reasons, the Commissioner's motion for summary judgment will be granted and the Commissioner's decision denying benefits will be affirmed. An appropriate order will be entered.

DATED: This 11th day of January 2007.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE